**MORGAN, LEWIS & BOCKIUS LLP**
**KENNETH J. TURNBULL (KT 4458)**
**MEGHAN CHERNER-RANFT (MC 8373)**
101 PARK AVENUE
NEW YORK, NEW YORK  10178
(212) 309-6000
*ATTORNEYS FOR DEFENDANT*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------- X
:
CHANA SCHWARTZ,                          :
:
      Plaintiff,                     :
:
:
  -against-                             :   CASE NO.  06-CV-4906 (DAB)(RLE)
:
:   *ELECTRONICALLY FILED*
:
:
MORGAN STANLEY DW INC.,                  :
:
      Defendant.                     :
---------------------------------------- X

**DEFENDANT'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendant Morgan Stanley Smith Barney LLC ("Morgan Stanley" or the "Firm")[1] provides the following Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment:

**A.     Morgan Stanley's Financial Advisory Business**

1.      Morgan Stanley operates a retail securities business through a network of branch offices nationwide.  Each branch is managed by a Branch Manager who is responsible for the

---

[1] Morgan Stanley Smith Barney LLC is the registered investment advisor and broker-dealer formed as a result of the Joint Venture between Morgan Stanley & Co. Incorporated and Citigroup, Inc. and is the successor to the named Defendant, Morgan Stanley DW Inc.

daily operation and administration of the branch, including personnel-related matters.  (Sengupta Dep. at 46.)[2]

    2.    Through individual Financial Advisors ("FAs") at each branch, Morgan Stanley provides clients with comprehensive financial planning services, tailored to meet individual investment goals and risk profiles.  (Marchak Dep. at 36-37.)

**B.**    **Morgan Stanley's Non-Discrimination and Anti-Harassment Policy**

    3.    As detailed in Morgan Stanley's Non-Discrimination and Anti-Harassment Policy (the "Policy"), the Firm is committed to providing a professional work environment that maintains employee equality, dignity and respect.  (See Affidavit of Kenneth J. Turnbull, Esq. ("Turnbull Aff.") at Exhibit ("Ex.") 9.)

    4.    It is the policy of Morgan Stanley to ensure equal employment opportunity in all phases of the employment relationship, without discrimination or harassment on the basis of race, color, national origin, religion, gender, pregnancy (including unlawful discrimination on the basis of a legally protected pregnancy/maternity leave), age, disability, citizenship, marital status, sexual orientation, veterans' status or any other characteristic protected by law.  (See Turnbull Aff. at Ex. 9.)

    5.    Morgan Stanley's Policy has an explicit and well-defined complaint procedure, under which employees who believe that they have been subjected to discriminatory and/or harassing behavior must report such behavior to their Human Resources Representative or to one of several specifically identified individuals.  (See Turnbull Aff. at Ex. 9.)

    6.    On August 9, 2000, Schwartz acknowledged that she received and read the Policy.  (See Turnbull Aff. at Ex. 10; Schwartz Dep. at 463.)

    7.    Schwartz received a second copy of the Policy via email in March 2004.  (See Turnbull Aff. at Ex. 9.)

---

[2] All referenced deposition transcript pages are attached to the Affidavit of Kenneth J. Turnbull ("Turnbull Aff.") dated December 4, 2009 and submitted herewith.

**C.      Chana Schwartz's Employment and Compensation with Morgan Stanley**

8.      Schwartz was hired by the Firm as a Financial Advisor Trainee in the Grand Central Branch in February 1997.  (See Turnbull Aff. at Ex. 11; Schwartz Dep. at 22, 279.)

9.      After successfully completing the Training Program, she graduated to the position of Financial Advisor.  (Schwartz Dep. at 25-26.)

10.     Schwartz continued to work in the Grand Central Branch as an FA until September 2, 2005, at which time she voluntarily resigned from the Firm.  (See Turnbull Aff. at Ex. 12; Schwartz Dep. at 23, 26, 33.)

11.     Arun Sengupta ("Sengupta") was the Branch Manager of the Grand Central Branch at the time Schwartz was hired and remained the Branch Manager until late August 2005.  (Schwartz Dep. at 24, 256-57; Sengupta Dep. at 256-57.)

12.     FAs, such as Schwartz, are paid incentive compensation, colloquially referred to by FAs as "commissions."  (Schwartz Dep. at 27.)

13.     "Commissions" are calculated formulaically based upon the FA's revenue production.  This formulaic calculation is detailed in a Payout Grid ("Grid") which is published annually in the Firm's FA Compensation and Recognition Program.  (See Turnbull Aff. at Ex. 13.)

14.     Under the Grid, the percentage paid increases as an FA attains designated levels of production.  (Schwartz Dep. at 280.)

15.     The Grid is applied uniformly to all FAs, with the exception of FA Trainees and some new recruits.  (Schwartz Dep. at 27-28, 280-81.)

16.     Schwartz admits she was paid on the same Grid as other Morgan Stanley FAs. (Schwartz Dep. at 28, 280-81.)

**D.      Distribution of Accounts**

17.     When an FA leaves Morgan Stanley, the accounts serviced by that departing FA are typically distributed to the remaining eligible FAs in the branch.  (See Turnbull Aff. at Ex. 14; Schwartz Dep. at 172-73.)

3

18. The Firm contacts clients by letter and, in many cases, telephone, in an effort to convince the clients to keep their accounts with Morgan Stanley, rather than following their former FA to his or her new firm. (Schwartz Dep. at 218; Marchak Dep. at 216-17, 272-74.)

19. In or around 2003, Morgan Stanley introduced a "Power Ranking" procedure for the distribution of accounts of departing FAs. (See Turnbull Aff. at Ex. 14; Schwartz Dep. at 178; Marchak Dep. at 44; Sengupta Dep. at 68.)

20. Under the Power Ranking System, each FA in the branch received a ranking that was formulaically derived through a fixed, weighted set of performance criteria. (See Turnbull Aff. at Ex. 14; Schwartz Dep. at 297-98.)

21. Based on these factors, each FA was ranked and the accounts were generally distributed in Power Ranking order. (See Turnbull Aff. at Ex. 14; Marchak Dep. at 60-61.)

22. The Power Ranking distribution order is not absolute, and exceptions are recognized and permitted. (See Turnbull Aff. at Ex. 14.)

23. If a client requests a specific FA to handle his or her account, Morgan Stanley will honor that request. (See Turnbull Aff. at Ex. 14.)

24. Other exceptions included an FA's product expertise, state licensing requirements, keeping household accounts together, language needs, a FA's pre-existing client relationship, and FA partnership arrangements. (See Turnbull Aff. at Ex. 14.)

25. In addition, an FA is always permitted to opt out of receiving certain distributions. (Schwartz Dep. at 300; Sengupta Dep. at 173, 272-73.)

**E.     Schwartz's Complaints Concerning Account Distributions**

26. Schwartz claims that, as a result of her gender, she was denied account distributions following the departure of other FAs from the Firm. (See Amended Complaint ¶ 14; Schwartz Dep. at 165-166, 175.)

27. Schwartz is unable to identify a single account that she was allegedly denied, nor can she identify any male FA who she believes received a distributed account that she should

4

have received in accordance with the Power Ranking process. (Schwartz Dep. at 175, 177, 180-81.)

28. Schwartz asserts that she received fewer IPO shares than male FAs. (See Amended Complaint ¶ 14.)

29. Schwartz has not identified a single IPO or other offering in which she received fewer shares than she believes she deserved. (Schwartz Dep. at 166, 171-72.)

30. Schwartz has not identified any specific IPO in which a male FA received more shares than a female FA. (Schwartz Dep. at 166-167, 171-72.)

31. Schwartz is not aware of any male FAs who received specific shares she feels she should have received. (Schwartz Dep. at 166, 171-72.)

32. From February 2003 through August 2005, Schwartz received 229 separate accounts through account distributions. (See Turnbull Aff. at Ex. 15.)

33. The assets in the accounts distributed to Schwartz had a total market value of approximately $24 million, and generated over $500,000 in revenue in the trailing 12 months ("T-12") before Schwartz received them. (See Turnbull Aff. at Ex. 15.)

34. According to the information contained in Plaintiff's expert report, the market value of each account transferred to Schwartz contained, on average, $107,873 in assets. (See Turnbull Aff. at Ex. 15.)

35. Plaintiff's expert, Dr. Jerry Goldman ("Goldman") analyzed three "sub-populations" of the FAs in the Grand Central Branch. In those three sub-populations, Dr. Goldman analysis revealed that the mean market value of the accounts transferred to males was $94,763, $77,254, and $76,983, respectively. (See Turnbull Aff. at Ex. 15.)

36. Dr. Goldman's analysis revealed that for the three "sub-populations" described above, the mean value of the T-12 revenues of the accounts transferred to males was $824, $647 and $644, respectively. (See Turnbull Aff. at Ex. 15.)

5

37.     According to the information contained in Plaintiff's expert report, the mean value of the T-12 revenue of the accounts transferred to Schwartz was $2,200 per account. (See Turnbull Aff. at Ex. 15.)

38.     Morgan Stanley's expert, Dr. Finis Welch ("Welch"), observed that the median dollar value of the assets reassigned to male FAs was $330,209, and the median prior year revenue on those assets was $2,814.  (See Turnbull Aff. at Ex. 38.)

39.     Dr. Welch's analysis revealed that the median asset value of accounts reassigned to Schwartz was $917,831 and the median prior year revenue on those accounts was $6,553. (See Turnbull Aff. at Ex. 38.)

40.     Dr. Welch found that the value of the assets received by Schwartz was 1.85 times larger than the value received by men with similar characteristics, and that the prior year revenue generated on the assets assigned to Schwartz was 3.20 times larger than the prior revenues of assets reassigned to men with similar characteristics.  (See Turnbull Aff. at Ex. 38.)

41.     In July 2005, FA Sheila Jamison resigned from the Grand Central Branch. (Jamison Dep. at 21, 242; Marchak Dep. at 150.)

42.     Due to an inadvertent error, Schwartz's name was omitted from the distribution list for Jamison's accounts.  (Marchak Dep. at 206; Sengupta Dep. at 9-10.)

43.     While distributing the accounts serviced by Jamison, the Sales Manager at the time, John Marchak ("Marchak") realized his error.  (Marchak Dep. at 180-81.)

44.     Upon realizing the mistake, Marchak told his manager, Sengupta, and immediately spoke with Schwartz to alert her to this error.  (See Turnbull Aff. at Ex. 16; Marchak Dep. at 181, 185-86, 188; Sengupta Dep. at 9-10, 270-71.)

45.     Marchak apologized to Schwartz for his mistake and addressed ways in which the error could be corrected.  (Schwartz Dep. at 336-39; Marchak Dep. at 185-86, 200.)

46.     Marchak's primary concern was that Schwartz be made whole to make up for his oversight.  (Marchak Dep. at 181, 203-05.)

6

47. In order to rectify the situation, Schwartz indicated that she wanted to receive an enhanced account distribution when the next FA left the Firm. (Schwartz Dep. at 338-39; Marchak Dep. at 203.)

48. Marchak agreed to this remedy, which he confirmed in writing. (See Turnbull Aff. at Ex. 16; Marchak Dep. 183, 203-05.)

49. The next account distributions in the Grand Central Branch occurred the following month, August 2005, when FAs Charles Winitch and John Steigerwald left the firm. (See Turnbull Aff. at Exs. 17 and 18.)

50. In total, Schwartz received more than $11 million in assets in these distributions, including an account distribution of $4.2 million from Winitch's book to make-up for the Jamison omission. (See Turnbull Aff. at Exs. 17 and 18; Schwartz Dep. at 317.)

**F.   Schwartz's Complaints Concerning Training and Networking**

51. Schwartz claims she was denied the opportunity to attend Wealth Advisors training. (Schwartz Dep. at 224.)

52. To be eligible to participate in the Wealth Advisors Training, an FA must meet certain minimum requirements, including having seven years of experience, $50 million in assets and $500,000 in gross revenue production. (See Turnbull Aff. at Ex. 19.)

53. Schwartz admits that she did not meet the criteria for admission to Wealth Advisors. (Schwartz Dep. at 224.)

54. At the time of her resignation, Schwartz's YTD production was $282,149. (See Turnbull Aff. at Ex. 20.)

55. In 2004, Schwartz's production was $420,642. (See Turnbull Aff. at Ex. 21.)

56. In 2005, Schwartz's production was $361,334. (See Turnbull Aff. at Ex. 22.)

57. Other than Wealth Advisors training, Schwartz admits she did not seek to attend any other Morgan Stanley training programs. (Schwartz Dep. at 234-235.)

58. Schwartz admits she was not denied the opportunity to attend any other training that she requested to attend. (Schwartz Dep. at 234-235.)

59. Schwartz was invited to participate in many other training and networking events, including the Morgan Stanley Women's Business Exchange, Morgan Stanley Boot Camp, and the 2003 Challenge Series Meeting in New Orleans. (See Turnbull Aff. at Exs. 23, 24 and 25.)

60. Schwartz declined to participate in a Due Diligence meeting in Washington, D.C. in June 2004. (Schwartz Dep. at 235-37.)

61. Schwartz claims she was not afforded the opportunity to attend informal lunches and dinners with regional management and her branch manager, Sengupta, that male FAs were afforded. (Schwartz Dep. at 238-39, 241.)

62. On or around January 21, 2003, Sengupta organized and held a lunch with the top ten producers in the branch for the previous year. (Marchak Dep. at 136; Sengupta Dep. at 128-29.)

63. Schwartz was not one of the top ten producers in the branch at that time. (Sengupta Dep. at 128-29.)

64. In late August 2005, John Campbell held a dinner for those FAs in the branch that were designated as Club Members (a description reserved for the highest producing FAs). (Marchak Dep. at 147-48.)

65. Schwartz was not a Club Member at that time. (Marchak Dep. at 147-48.)

66. Schwartz admits that she is not aware of any other specific lunches or dinners to which she was not invited. (Schwartz Dep. at 238-40.)

67. Schwartz admits that she did not make any requests to attend networking events that were turned down. (Schwartz Dep. at 238.)

**G.** **Schwartz's Retaliation Complaint Concerning A Compensation Mistake**

68. In December 2004, Schwartz inquired with Morgan Stanley's Disability and Leave Unit ("DLU") about taking a short term disability ("STD") leave. (See Turnbull Aff. at Ex. 26; Pfeffer Dep. at 14-15, 20, 23.)

69. Schwartz did not take a disability leave, but was incorrectly placed on STD by the DLU, and, as a result, received a series of erroneous STD payments beginning in December

8

2004.  (See Turnbull Aff. at Ex. 27; Jee Dep. at 102; Pfeffer Dep. at 14-15, 20, 23; Sengupta Dep. at 234-36.)

70. Upon realizing the error, Alana Albritton, the Grand Central Branch Administrative Supervisor, contacted members of the DLU, as well as the Firm's Payroll department, to inform them that Schwartz was improperly placed on STD and was being incorrectly paid as a result.  (See Turnbull Aff. at Exs. 26 and 27; Sengupta Dep. at 237-38.)

71. In or around late January 2005, Sengupta alerted Carly Kramer ("Kramer") (now known as Carly Pfeffer), the Grand Central Branch's Human Resources Representative, to the issue and sought her assistance in resolving it.  (Sengupta Dep. at 241-42.)

72. Over the next several months, Kramer reviewed Schwartz's payroll history in detail.  (See Turnbull Aff. at Ex. 28; Pfeffer Dep. at 34-35.)

73. Kramer created a detailed report of the STD payments and the subsequent adjustments to Schwartz's pay that occurred from January 2005 through April 15, 2005, and provided that report to Schwartz.  (See Turnbull Aff. at Ex. 29; Pfeffer Dep. at 28-29.)

74. Kramer then followed up with a detailed letter further analyzing the erroneous STD payments and adjustments and providing Schwartz with the underlying documentation.  (See Turnbull Aff. at Ex. 30.)

75. After reviewing Schwartz's entire payroll history, Morgan Stanley determined that any errors in her pay were ultimately fixed to Schwartz's benefit, in an amount exceeding $3,000.  (See Turnbull Aff. at Ex. 28; Jee Dep. at 60-61.)

76. Morgan Stanley did not seek to recover this amount from Schwartz.  (Pfeffer Dep. at 56-57; Sengupta Dep. at 236.)

77. Schwartz was not satisfied with the Firm's response.  (See Turnbull Aff. at Ex. 28; Schwartz Dep. at 414; Jee Dep. at 51; Pfeffer Dep. at 30.)

78. Schwartz believed the Firm deliberately initiated the pay errors in retaliation for her limited participation in an EEOC investigation into the complaint of another employee.  (Schwartz Dep. at 350.)

9

79. In November 2004, Kathryn O'Hagan, a former FA in the Grand Central Branch, filed a charge of discrimination with the EEOC, which Morgan Stanley responded to in January 2005, denying her allegations in all material respects. (O'Hagan Dep. at 27.)

80. Thereafter, the EEOC conducted an on-site visit at the Grand Central Branch to investigate O'Hagan's claims. In connection with this visit, Schwartz met with both the EEOC and with Morgan Stanley's legal counsel and provided information regarding O'Hagan's claims. (O'Hagan Dep. at 161.)

81. Kramer referred Schwartz to Bernice Jee, the Administrator of Morgan Stanley's dispute resolution program, Convenient Access to Resolutions for Employees ("C.A.R.E."), to see if Jee would have better luck in dispelling Schwartz's suspicions. (See Turnbull Aff. at Ex. 28; Jee Dep. at 40, 44-46.)

82. After speaking with Schwartz, Jee organized and convened an in-person meeting on August 24, 2005 at which Schwartz was able to meet with members of the DLU, Benefits and Payroll Departments so that they could respond to Schwartz's concerns and questions. (See Turnbull Aff. at Ex. 31; Schwartz Dep. at 414-17; Jee Dep. at 60, 62-64, 84, 86.)

83. During that two hour meeting, Schwartz raised numerous questions regarding the errors in her pay. (See Turnbull Aff. at Ex. 31.)

84. Those attending the meeting attempted to answer her questions, including explaining that it may have been the conversion from one payroll system to another that caused the errors in Schwartz's pay and that once the initial error occurred, the system had a waiting period in place before DLU could take steps to rectify the problem. (See Turnbull Aff. at Ex. 31; Jee Dep. at 91, 116, 118-19.)

**H.     Schwartz's Complaints Of Harassment And Her Resignation**

85. At the conclusion of the August 24, 2005 meeting, Schwartz asked that Kramer and Jee remain to speak with her further. (See Turnbull Aff. at Ex. 31; Schwartz Dep. at 421; Jee Dep. at 121-22.)

86. She then raised, for the first time, allegations that she was being retaliated against and harassed by Sengupta. (See Turnbull Aff. at Ex. 31; Schwartz Dep. at 421-22; Jee Dep. at 22-24; 125; Pfeffer Dep. at 82.)

87. Schwartz stated that she believed Sengupta had accused her of making a trade in a customer's account solely for the purpose of generating commission. (See Turnbull Aff. at Ex. 31.)

88. Schwartz then abruptly asserted that she felt she had been sexually harassed by three male co-workers in the Grand Central Branch in June and July 2005: Ruben Ramos, John Steigerwald and David Pierce. (See Turnbull Aff. at Ex. 31; Pfeffer Dep. at 81-82.)

89. Schwartz also claimed that she had been harassed in 2000 by a former employee, Eric Lupo. (See Turnbull Aff. at Ex. 31; Jee Dep. at 126.)

90. Kramer and Jee asked Schwartz to provide as much detail as possible about her allegations, and told her that they would investigate her claims. (See Turnbull Aff. at Ex. 31; Jee Dep. at 127-29; Pfeffer Dep. at 83.)

91. Schwartz stated that she had her notes at home which contained the specifics of the alleged conduct. (See Turnbull Aff. at Ex. 31; Jee Dep. at 127-29.)

92. Kramer and Jee asked to meet with Schwartz when she had her notes in front of her. (Jee Dep. at 127-28.)

93. For the next several days, Kramer and Jee repeatedly attempted to follow-up with Schwartz about the issues she had raised. (Jee Dep. at 133-34; Pfeffer Dep. at 86.)

94. The following day, August 25, 2005, Jee emailed Schwartz and asked to meet with her "ASAP" to discuss the "very serious allegations" Schwartz had raised the previous day. (See Turnbull Aff. at Ex. 32; Schwartz Dep. at 435-436; Jee Dep. at 134-135.)

95. Jee asked Schwartz to bring her notes to that meeting, and offered to meet with Schwartz the next day, which was a Friday, or the following Monday. (See Turnbull Aff. at Ex. 32; Schwartz Dep. at 435-436; Jee Dep. at 134-135.)

96.     Schwartz was not able to meet with Jee and Kramer on Friday, August 26, 2005. (<u>Schwartz Dep.</u> at 436.)

97.     Schwartz was not able to meet with Jee and Kramer on Monday, August 29, 2005. (<u>Schwartz Dep.</u> at 436.)

98.     Schwartz informed Jee that she wanted an explanation of certain Time Card codes and would like a meeting with the FA Compensation Department prior to any meeting with Jee and Kramer.  (<u>See</u> Turnbull Aff. at Ex. 33; <u>Schwartz Dep.</u> at 438.)

99.     Jee again reminded Schwartz of the seriousness of her allegations and reiterated her request for a meeting with Schwartz about the harassment and retaliation issues she had raised.  (<u>See</u> Turnbull Aff. at Ex. 33.)

100.    Schwartz tentatively agreed to meet with Jee and Kramer on Tuesday, August 30, 2005, but later cancelled that meeting, ostensibly to attend client meetings, and said she would not be able to meet until after Labor Day.  (<u>See</u> Turnbull Aff. at Exs. 34, 35 and 36; <u>Schwartz Dep.</u> at 440-41.)

101.    Jee again informed Schwartz that it was important to meet before Labor Day to discuss her allegations, and offered to meet before the market opened so as to not interfere with Schwartz's client meetings and demands.  (<u>See</u> Turnbull Aff. at Ex. 36; <u>Schwartz Dep.</u> at 448-49; <u>Jee Dep.</u> at 142-43.)

102.    When Jee did not hear back, she again emailed Schwartz on Wednesday August 31, 2005.  (<u>See</u> Turnbull Aff. at Ex. 37.)

103.    Schwartz responded to Jee, saying she was on her way out and would respond "within the next few days."  (<u>See</u> Turnbull Aff. at Ex. 37.)

104.    Schwartz did not respond until the late afternoon of Thursday, September 1, 2009, at which point she offered to meet with Jee and Kramer the following day, Friday, September 2, 2009.  (<u>Pfeffer Dep.</u> at 89-90.)

105.    On Friday, September 2, 2005, Schwartz emailed Kramer and Schwartz to inform them that, effective immediately, she was resigning from Morgan Stanley. (See Turnbull Aff. at Ex. 12; Schwartz Dep. at 448-49.)

106.    Following Schwartz's resignation from the Firm, Marchak attempted to contact the clients Schwartz had serviced while at Morgan Stanley for the purpose of encouraging those clients to keep their accounts at Morgan Stanley, rather than follow Schwartz to her new employment. (See Turnbull Aff. at Ex. 39; Schwartz Dep. at 363-64; Marchak Dep. at 216-17, 272-74, 278-79.)

I.    **Schwartz's Description Of the Alleged Harassment**

107.    Although Schwartz never did describe the alleged harassment to Jee or Kramer, she did offer those details in her deposition. (Schwartz Dep. at 53-54, 57, 73-74, 78, 87-88, 93-95, 97-98, 99-100, 102, 118, 120-21, 125, 132-36, 263, 286-88.)

108.    Schwartz testified that Assistant Branch Manager Eric Lupo told Schwartz that he wanted to make love to her, that she was sexy and that her clothes were too tight. (Schwartz Dep. at 53-54, 263.)

109.    Schwartz testified that Lupo made kissing noises when walking by her. (Schwartz Dep. at 57.)

110.    Schwartz admitted that the alleged conduct of Lupo all took place between 1998 and 2000, when Lupo left the Firm. (Schwartz Dep. at 53-54, 263.)

111.    Schwartz testified that Assistant Branch Manager Chris O'Connor told Schwartz that clients opened accounts with her because she had a sexy voice, and accused her of having an affair with another FA. (Schwartz Dep. at 73-74.)

112.    Schwartz admits that any conduct by O'Connor occurred between 2000 and mid-2003, when he left the Firm. (Schwartz Dep. at 73-74.)

113.    Schwartz testified that FA David Pierce expressed interest in her female clients, "hit on" other females in the branch, declared that he wanted to hug Schwartz on July 6, 2005,

13

and asked Schwartz if she wore a wig and what color her hair was.  (Schwartz Dep. at 78, 87-88, 93-95, 97-98.)

114. Schwartz testified that, during June and July 2005, her Sales Assistant Ruben Ramos asked her if she would wear a bathing suit when she had mentioned going to the beach in Long Island, told her she should go on the Howard Stern or Jerry Springer show, asked her about her weight, made comments implying she was having an affair with someone in the office and assumed that she must be having an affair with someone to have the success she had.  (Schwartz Dep. at 99-100, 102, 118, 120-21, 125.)

115. Schwartz testified that FA John Steigerwald touched her inappropriately on three occasions in June 2005, by putting his arm around her shoulder twice and touching the middle of her back as he was walking past her.  (Schwartz Dep. at 132-36.)

116. Schwartz testified that she heard from other females that males in the branch watched porn during business hours.  (Schwartz Dep. at 286.)

117. Schwartz admitted that she never saw any males watching porn, never saw any pornography in the office herself, and never received any emails of a pornographic nature at any time.  (Schwartz Dep. at 286-88.)

Dated: New York, New York  
December 4, 2009

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By:  /s/ Kenneth J. Turnbull

    Kenneth J. Turnbull (KT-4458)  
    Meghan Cherner-Ranft (MC-8373)  
    101 Park Avenue  
    New York, NY  10178  
    (212) 309-6000

*Attorneys for Defendant Morgan Stanley Smith Barney LLC*